R.BP0RT OE MAJORITY OE COMMITTEE.
Assembly Chamber, February 20th, 1861.
Mr. Eisher from a majority of the committee on privileges and elections, to which was referred the petition of Lewis Hopps, claiming the seat now occupied by Wm. J. C. Kenny, reported adversely thereto, which report was laid on the table and ordered printed, and is as follows, to wit:
In Assembly, February 20th, 1861.
Report oe the Majority oe the Committee on Privileges and Elections, on the Petition oe Lewis Hopps, Claiming ti-ie Seat now occupied by William J. C. Kenny.
The committee on privileges and elections, to which was referred the petition of Lewis Hopps, claiming the seat occupied by W. J. C. Kenny, as member of the fourth Assembly district of the city and county of Hew York, report:
That they have heard the evidence adduced by the petitioner in support of his petition, and that offered by the sitting member in opposition thereto, together with the allegations and arguments of the parties thereon, and have come to the following conclusions thereon:
This contest arises from a doubt as to the exact vote polled for Mr. Kenny, at the sixth ¿lection district of the seventh ward of the city and county of Hew York. 'It is claimed by the petitioner, Lewis Hopps, that the vote for Mr. Kenny was two hundred and one ; it is admitted on all hands that this vote would defeat Mr. Kenny. The official return gave Mr. Kenny two hundred and ten ; it is admitted that this vote, if correct, elects him.
The petitioner attempts to sustain his allegation, that the vote for Mr. Kenny, at the election district in question, was two hundred and one, and not two hundred and ten, on the alleged fact that the chairman of the board of canvassers made public oral proclamation at the closing of the canvass, that the vote was two hundred and one. This he attempts to show by the evidence of policemen and other by-standers, who so understood the announcement, and made memoranda of the same at the time on slips of paper.
*315 The following is, in substance, the evidence relied on to support the petition, and also that offered in opposition thereto. The material facts on both sides are given :
■Theron B. Bennett, police captain, identifies a slip of paper as the one brought to the station-house, containing a memorandum of the vote for Kenny as two hundred and one. He also testifies to a custom of the police departrrfent to detail men at each election district, with printed blanks, whose duty it is to fill them out as the votes for the respective candidates are announced, and return them immediately to the station-house. Mr. Bennett was not at the polls, and knows nothing personally of what occurred there.
Thomas W. Thorne, sergeant of police, also identifies the same slip of paper as the one brought to the station-house. He was not at the polls, and knows' nothing personally of what occurred there.
Henry Moran, policeman, was one of the officers detailed at the polls in question, and was present at the canvassing of the votes. He says: “ I heard the chairman declare the result; as far as I can recollect, he declared for Mr. Hopps two hundred and seventy-three, and for Mr. Kenny two hundred and one, I think, to the best of my knowledge.” On his cross-examination, he testifies that the vote, as declared, was two hundred and one. He says : “I put the figures down in my pocket-book; it is in my house; I looked at it last night; I put it down a month ago ” (which 'would be nearly three months after the election.) This witness was the man who took the slip containing the Assembly vote to the station-house. He says it was handed to him by Policeman Jubo. (There was evidence to show that this officer had been on duty the whole of the preceding day and night, and was up all of the night of election day, and was, in consequence, somewhat drowsy, and slept during a part, at least, of the canvass. But no blame was imputed to the officer.)
Joseph Jubo was another policeman detailed at the polls, and was present at the canvassing of the votes. He says: “I heard the announcement made by the chairman of the board ; it was two hundred and seventy-three for Hopps, and two hundred and one for Kenny ; I made out the slip ; I was sitting behind the chairman of the canvassers ; I gave it to Moran, and told him to take it to the station-house; the figures on it are made by me ; they counted the vote for Assembly over three times.”
On his cross-examination he says: “ The first announcement made was the same as shown on the slip of paper made by me. The second *316 announcement was the same. The third, I believe, was a little different. I don’t recollect as to what figures the difference was on the third announcement.” (It is observable that this evidence, so far as it goes, goes to show that there were several announcements of the vote; that the figures put down by him, on his slip ©f paper, were those first announced, and that the last announcement was different in some respects, but how, the witness canfiot state.) •
The slip of paper, which was produced, - shows that the figures opposite Kinney’s name have been scratched out, and other figures, two hundred and one, written by the side of the first figures. This witness Jubo (who it will be remembered, himself filled out the blank slip), thus testifies in respect to that alteration :
“I can’t say what the figures written in front of Kenny’s name, were at first. At first it looks like two hundred and ten scratched out. I scratched out the figures, because they thought there was a mistake. I don’t swear that the figures scratched out are two hundred and one. I would not swear they are not two hundred and ten ; can’t say that one of the announcements was two hundred and eleven. Don’t recollect telling anybody that it was so; nor two hundred and thirteen, nor two hundred and fifteen, nor two hundred and ten. All I know about it is, what there is on that paper.”
Thus it appears quite possible that this witness, who is a principal witness for the petitioner, had the figures written on his slip at first two hundred and ten, and that there was considerable difficulty and doubt, and several announcements, naturally leading to confusion.
John Hennesey, another policeman, testified that he was present at the canvass; that he arrived there just after they began to canvass the Assembly vote ; that they had counted the Assembly vote mice before he got there; that there had been a disagreement on the first vote; that they took the boxes and turned the ballots on the table ; that they counted them again, twisted up in bunches of tens, and then opened the bunches and counted them again by single ballot; after which, Mr. Petty, the chairman, stood up and announced the vote as two hundred and one for Kenny; thereupon the ballots were destroyed. He further says, on his cross-examination, that he took note of the Assembly vote, because it was a “ tight run,” but that he neither took nor kept any memorandum of the vote.
Alexander F. Roberts testified that he was clerk of the election and clerk of the board of canvassers.
(It is proper in this connection, to mention that under the registry *317 law, in New York city, the canvassing of the votes is not done by the inspectors. The inspectors, on closing the polls, deliver the ballot-boxes to the three canvassers, who organize on the spot, and proceed to canvass the votes and make the returns, as is done in other counties by the board of inspectors. The clerks of the inspectors usually continue to act as clerks to the canvassers.)
^Roberts, clerk of the canvassers, further testifies that he did not keep tally of the Assembly vote, but that he heard the chairman, Petty, announce the vote as two hundred and one for Kenny.
On cross examination, he says : “ Fordham, the other clerk, kept the tally on Assembly vote. I did not make any memorandum, but was writing out the presidential returns at that time-. It was part of my duty to make the return to the canvassers. I made the returns for Assembly. That appears two hundred and ten for Kenny, as I' made it. I could not tell a month after the election what the number of votes was for any other candidate, from my memory. I hap" pened to recollect this, because I went to the board of supervisors while they were counting the returns. Hopps came to me, and asked me if I recollected the vote. It was the week following the.election. I tried to recollect, and told him I could not then tell. He asked me if the figures were not two hundred and one, and when he said that, it came to my mind that that was the vote. I don’t think I would have recollected independent of that.”
Here the counsel for Mr. Hopps rested his case, and on behalf of Mr. Kenny—
. Daniel L. Petty, chairman of the board of canvassers, and who canvassed the vote at the polls, was examined. He testifies:
“ Our first canvass of the vote for Assembly, was between two and four o’clock in the morning. Mr. Murphy (on the first count) differed ten votes from Fordham, the clerk. Meanwhile some one in the room remarked that the vote was very close. I insisted thfe vote should be opened and recanvassed, as the difference of ten flight decide the vote. In recánvassing, we were very particular; one man would open the ballots and recount them, and hand them to another, and he would do the same, and tlié third man the same. In the recanvass ‘ (the second time), we found four (4) McCauley votes among Kenny’s, very much resembling the Kenny .votes (McCauley was a third candidate). Then, in some other boxes, we had found' two (2) tickets for Assembly. These two we had put. aside. Ve first found two hundred and fifteen for Kenny; we deducted the four *318 (4) MqCauley votes. Then we put in the two we found in the other boxes and mixed them np with the others, and drew two oat. This we did after the second canvass. We drew out one Kenny and one McCauley vote. That brought Kenny’s vote to two hundred and ten. On the last canvass, all three (canvassers) kept a tally.
“ I did not announce the vote as two hundred and one. I announced it as it was' officially returned. That was two hundred and ten. I was chairman of the board of canvassers. Thomas Murphy and Mr. Marriner were the others. Murphy and I were republicans and Marriner was a democrat. I saw the returns made out, and that they were made out correctly. I watched particularly the Assembly returns, because I knew there was a feeling between Hopps and one of the clerks, and I was determined the thing should be straight. One of the policemen was fast asleep and snored aloud, and I called attention to it.
“I watched Fordham (the democratic clerk) very closely.
“ At the close of the first-canvass, Mr. Murphy made two hundred and five for Kenny ; Fordham made it two hundred and fifteen, and said he knew it was correct. I insisted on a recanvass.”
On cross-examination, this witness states that he had no acquaintance with Kenny, and never met him till the day before he testified. He further testifies that his recollection was based on the returns, andón the other circumstances that were detailed; that, independent of those, he could not recollect, and that his memory was bad on figures. He voted for Mr. Hopps and watched the clerks very sharply, and was satisfied they were correct.
Thomas Murphy testified: I was one of the canvassers. There were four or five candidates. The declared vote on Assembly was two hundred and seventy-three for Hopps and two hundred and ten for Kenny. We counted the ballots twice. I found two hundred and five for Kenny at first. One of the clerks (Fordham), who was opposed to our candidate, Mr. Hopps, kept the tally. Being a little afraid to trust to him, I kept the tally myself. He made it two hundred and fifteen. We agreed to count them over, and counted them over. We found two hundred and fifteen correct. I discovered (4) four McCauley tickets, counted in for Kenny, and handed them back to Petty, chairman of the board. They were deducted from Kenny and added to McCauley. The number of votes overrun the poll list two votes. We put the ballots in and drew out two by chance. We drew out a Kenny and a McCauley ticket; that made Kenny’s vote *319 two hundred and ten. There were some informal announcements. The last formal announcement was two hundred and ten for Kenny, and two hundred and seventy-three for ITopps. I saw the return before I signed it. It was written two hundred and ten and two hundred and seventy-three. That was correct. I watched Fordham, the clerk, very carefully, and am a republican.”
On his cross-examination, he says: “ I always knew the votes, and have always since remembered them distinctly. We all agreed on the vote, and I directed Mr. Petty to get up and announce it. I remember it distinctly. It was two hundred and seventy-three and two hundred and ten. Each canvasser counted all the votes. If I had not seen the returns at all for a year, I should have remembered the announcement and the vote.”
It will be noticed that he swears very positively and clearly, and professes to have an excellent memory.
George H. Wordham, testifies: “ I was one of the clerks of the election. I kept the tally on account of the Assembly votes on the first count. I found two hundred and fifteen votes for Kenny, and two hundred and seventy-three for Hopps. Murphy found two hundred and five for Kenny, and same as I for Hopps. We counted the ballots the second time. We found Hopps’ vote correct, and Kenny’s vote correct, except as to four (4) votes counted for Kenny, which belonged to McCauley, which we deducted from Kenny and gave to McCauley, making Kenny’s vote two hundred and eleven. Then there were two ballots more in the box than the poll-list called for. One of the canvassers, Marriner, drew out two ballots from the box. We destroyed the two ballots. One was for Kenny and one for McCauley. I kept as careful an. account as I could. Two hundred and ten were finally allowed to Kenny. The canvassers all agreed to that. Don’t remember hearing any vote announced. I think I did not make out the returns. I think Roberts did. I saw the returns when they were made. I believe they were correct, to the best of my knowledge. I don’t think there was any mistake as to filling up the returns. Can’t say the policemen were asleep. I heard one of them snore. We clerks watched each other pretty sharp. They wei’e interested on one side, and I on the other. I was a democrat and they were republicans.”
Gross-examination. — Question: “ Did you say at the polls that day, to Mr. Petty or any one else, that you meant to defeat Mr. Hopps if you could ?”
*320 Answer: “ I think very likely I did; but I did not say that I meant to do it by any dishonorable means. I may have asked Roberts to let me fill out the returns. We first counted the votes and found two more than the poll list.” Pie. again testifies that there was a discrepancy on the first vote; that they again counted the votes in bundles of ten, as they had been twisted; that they then untwisted the bundles and counted them again, and discovered the four McCauley votes.
John Glass, a bystander, who was present at the canvass of the vote testifies that he kept a tally. “ When they got through I set it down. I heard the clerks that kept the tally announce the vote. The announcement by one of the clerks was two hundred and fifteen ; the other, two hundred and five for Kenny. On account of the disagreement, there could be no announcement. Mr. Petty proposed to count them over. Pie counted two hundred and fifteen. Pie said that was correct. Then I took the figures down with pencil and paper. I did not stay to see them counted again. I made the memorandum at the time.”
Memorandum produced, and marked B, Jan. 30, 1861. This memorandum shows the figures :
PEopps. 2V3
Kenny..'... 215
McCauley. 41
O’Shea .•. 1
James M. Bailey testified : “I was present during a portion of the canvass. There was a dispute between one of the clerks and one of the canvassers. One of the canvassers had two hundred' and five, and the clerk had two hundred and fifteen for Kenny. There was no dispute about PIopps’ vote, two hundred and seventy-three. They took them out of the cigar box, and counted them again ; did not open the ballots. After they got through, they all agreed upon two hundred and fifteen. Petty said, ‘ that is right, Glass, put it down on a piece of paper.’ ”
Patrióle H. Keenan testified: “ I was present while part of the vote was canvassed, but left before they got through. Hopps’ vote was counted first, two hundred and seventy-three; when they counted the vote for Kenny, there was a difference, one had two hundred and fifteen, the other, who sat at the left of Fordham, had two hundred and five. Petty said they would count again. They took the vote *321 out of the cigar box and counted again, and made it two hundred -and fifteen.”
Here counsel for Iienny rests, and on the part of Hr. Hopps,
George A. Rutzer testified: “ I attended , at the poll; I did not see them canvass; got in there just before they got through the canvass, of Assembly votes; Petty made the announcement, Hopps two hundred and seventy-three, Kenny two hundred and one ; I took it down on paper at the time; I put it down, and went directly to Hopps’ house.” (The paper was put in evidence, and marked O, Jan. 30, 1861. It shows, indistinctly written, Hopps two hundred and seventy-three, Kenny two hundred and one.) “ I heard the announcement distinctly; heard no other announcement; Mr. Petty got up and announced the vote.”
On cross-examination, he says; “ I was not close enough to see what they were doing. I am unable to say how they counted them; I got in there just in time to here the announcement; I don’t know whether I should have remembered, independent of that memorandum ; I have used that paper every day since; my customers’ names are on it.”
Allen S. Haynes testified : “Went to the polls about three o’clock in the morning, and asked the board of canvassers for the vote on Assembly ; Mr. Petty called it off, two hundred and seventy-three for Lewis Hopps, and two hundred and one for Kenny; I set it down in a memorandum book, and left the place.”' (The book was produced, and the leaf containing the memorandum torn out and put in evidence, and marked JD, Jan. 31, 1861. It shows the figures, Hopps two hundred and seventy-three, Kenny two hundred and one.)
On cross-examination, he testified : <£ I asked somebody, and he told me the vote had been counted; I did not know what it was; I have spoken about this case with Hopps and liis counsel, and a good many ; I have been a member of a fire company ; I have been intimate with Hopps, and was anxious he should be elected.”
Here counsel for Hopps rests, and on behalf of Mr. Kenny,
James 0. Eeefe testified: “Went to the polls for the returns on the night of-election ; I asked Pordham for the vote; Petty got up and asked Fordham what he made it, he replied, two hundred and seventy-three for Hopps, and two hundred and fifteen for Kenny ; Petty took the votes out of a cigar box and said: ‘ To be sure, we will count them over again.’ He counted the tickets into the box and said, ‘ that is right; that is what I make it.’ I make a memorandum *322 there; the paper produced is that memorandum.” (Paper put m evidence, and marked E, Jan 31, 1861. This paper shows a column of figures footed up, the last number, except the footing, being two hundred and fifteen, as follows;
62
141
133
CO CO CO
T — 1 rH
O
tH
Ci ■^H co
1C T — { cq
864)
“ I took down Kenny’s vote only. The last on the paper is the vote for Kenny.”
On cross-examination, he says: “ I never spoke to Kenny till last night about this memorandum ; never told anybody about this memorandum till I was coming up in the cars on Tuesday.”
John Mcwriner, the third canvasser, testified : “ I was one of the canvassers. We commenced canvassing Assembly vote, and counted them out in piles of ten each. We put them into a cigar box, and then footed up the tally, and the result was that Mr. Kenny had two hundred and fifteen votes ; Mr. Hopps, I think, had two hundred and seventy-three. There was some difference of opinion between Eord-ham and Petty, and Mr. Murphy also said they did not tally. Mr. Petty said we had better go over .it again, as it was getting to be pretty close. Some outsiders were dissatisfied also. We then opened the bundles, and. unfolded the tickets, and then counted them over carefully, and found two or three tickets that belonged to McCauley; Kenny’s name had been scratched out with a pencil and McCauley’s name inserted. Those tickets were deducted from Kenny’s vote, making his vote two hundred and thirteen or two hundred and twelve. There were then two ballots more than the poll-list. We put them all in the box and shook them up, and I drew out two ; one was a Kenny and one was a McCauley vote. That is all I know. We all agreed that Kenny had two hundred and ten. I saw the returns that evening after they were made out and signed; they were *323 correct, to the best of my knowledge. I heard an announcement made of the result by Mr. Petty, chairman of the board, and only once, to the best of my knowledge. It was two hundred and ten for Kenny. I heard no announcement of two hundred and one by any of the canvassers. I did not hear any one outside say two hundred and one. There was an outsider said it did not tally. I saw one of the'policemen asleep and^wokehim up myself. He was a stout man. It was after twelve o’clock at midnight. * I , awoke him to take the tickets and burn them up. It was while the canvass was going on that he was asleep. I woke him up to burn up the tickets. They were pretty .well fagged out, all of them. They had been up all day and all night.” o
On examination, he says: “I was a canvasser and inspector in thirteenth ward, New York, for four- or five years, and two years in the seventh ward. I kept no memorandum only at the time of counting. I know I could have told a -week after election what the returns for Assembly were. I have heard Fordham (the clerk) say he would do all he could to defeat Mr. ITopps. We found one or two Assembly tickets in the other boxes. There was a difference between Fordham’s and Petty’s count. Fordham had it two hundred and fifteen ; Petty had it one or two different. I am not positive as to the difference. I have talked with Fordham about it several times. The two we drew out was one for Kenny and the other for McCauley. We counted up and found two hundred and ten. I have no positive recollection about the tickets in the other boxes. , I know the officer was asleep : I woke him up myself.”
Here the testimony was closed.'
' The only question is one of fact. ,Was the vote for Mr."Kenny two hundred and one or two hundred and ten at the district in question ?
To determine this question, two other questions arise.
First. Was there an announcement of two hundred and one made by the chairman of the board ? and,
■Second. If there was such an announcement, is that fact proof conclusive as against the returns fortified by the evidence in the case, that such was the vote ?
First. Was there an announcement of two hundred and one made by the chairman of the board ?
Let us judge by the evidence above detailed, the substantial parts of which on both sides are above given. The first two witnesses for the petitioner (Bennett and Thorne) were not at the polls at all. *324 They only identify the slip filled out by Jubo as the one brought to the police' station.
Moran, policeman, testifies, “as far as he can recollect,” and “to the best of his knowledge, that the announcement was two hundred and one.” He made a.memorandum of it about three months after election in his pocket-book. -He was quite drowsy and asleep during part of the canvass.
Jubo, policeman, made out the slip, and sent it to the police station by Moran. His evidence is that the figures put down by him (two hundred and one) were those first announced, which is "contradicted by the great weight of evidence, which tends to show that the first count was two hundred and fifteen. Moreover, the figures first made by him are scratched out, and he is altogether uncertain what those figures were; and he says there were several announcements.
John Hennesey, policeman, testifies that the announcement was two hundred and one', but that he kept no memorandum.
Alex. E. Roberts, clerk of the canvassers, testifies to the announcement of two hundred and one, but frankly admits, on his cross-examination, that he would not have recollected it, but for having been reminded of it a week after election by Mr. Hopps. Moreover, it was his duty to make out the returns. He says he did make them out, and made them out two hundred and ten. Why did he do this if the announcement was two hundred and one ?
G-eorge A. Rutzer came in just before the close of the canvass, and says he heard an announcement by the chairman of two hundred and . one, and made his memorandum of it which he produces. He says that he was not near by; not close enough to see what they were doing; but got in just in time to hear the announcement.
Allen S. Haynes, an intimate friend of Mr. Hopps, came in about three o’clock in the morning, after the close of the canvass, and inquired as to the vote, and he says on his direct examination that Mr. Petty called it off two hundred and one. He made a memorandum which lie produced. In his cross-examination, he says he “ asked somebody, and he told me the vote had been counted.” It is not pretended that this was a public announcement, but information somebody, perhaps chairman Petty, gave him.
Here are then six witnesses who understood the vote to be two hundred and one. Jubo, Rutzer and Haynes made memoranda of the vote. Jubo is the only one of the three who witnessed the canvass. Rutzer and Haynes came in at, or after the close of the can *325 vass. Moran and Hennessey were very mach fatigued by the sleeplessness and labor of two nights and a day, and their faculties may reasonably be supposed to have been somewhat dulled by exhaustion, and .Hoberts the clerk, frankly admits that his recollection is based on Mr. Iiopps reminding him, without which he could not have recollected and that he made the returns all contrary to what he now declares the announcement to have been. This is the whole case for the petitioner, and on that he relies to establish his claim, that the vote was two hundred and one, not two hundred and ten.
It is not necessary to suppose that any of these witnesses have been guilty of bad faith or improper motives in their evidence, even if we differ from the conclusion sought to be drawn. The principal witness is Jubo, who testifies that he sat behind the chairman of the canvassers and witnessed the canvass. It will be remembered that he says his memorandum was made from th& first count, when the evidence is clear that the first count showed two hundred and five and two hundred and fifteen, and not two hundred and one, and moreover, that the figures on his slip have been altered. It is quite, possible that he honestly made a mistake. ¥e all know the liability of mere by-standers, who do not take an official part in the canvass, to indulge in conversation, or other incidental occupation.' A mere by-stander, even if it be his business to collect returns, is not likely to have his attention constantly called to the whole canvass during' its entire progress. It is pretty clear that there was some idea among outsiders that the vote was two hundred and one. It is possible that Petty may so have announced it. Aman might easily read two hundred and ten, two hundred and one by mistake, and vice versa. But when we consider the evidence to the contrary, even this will appear impossible.
Daniel L. Petty, chairman of the board, testifies fully, positively and clearly, that the vote was two hundred and ten, and the annorincement also. He explains fully how the vote was first counted, and showed a discrepancy ; the .clerk, Pordham, having it' two hundred and fifteen and one of the canvasser’s two hundred and five. He insisted on a re-canvass, when the figures two hundred and fifteen proved to be correct. ' He explains how this two hundred and fifteen was reduced to two hundred and ten. Ho better evidence can be given, it would seem than this. He was chairman of the board. His mind was constantly intent on the business. It was his duty. He had come fresh to his duty as canvasser on the close of the *326 polls. He knew that the vote was close, and that there was a jealousy between Fordham (the clerk), and Hopps (the candidate). He says that on these accounts he took special care, and is satisfied the returns are correct. His evidence is its own best commentary, and reference is made t'o it. He has no acquaintance with Kenny whatever ; never saw him till the day before he testified, and was a political friend of Hopps. He says he watched the clerk very sharply.
Thomas Murphy testifies to the same general effect. He corroborates Mr. Petty the chairman, in every important particular. He found two hundred and five for Kenny on the first count, and Ford-ham, the clerk, two hundred andfifteen. In a re-canvass, Fordham’s count was found to be correct. He then explains how it was reduced to two hundred and ten. He kept tally himself, and took special pains. ' He says his memory is excellent, and that ho could remember that vote a year without any refreshing of his memory, and that he cannot be mistaken. He spoke with great confidence, arid his manner and appearance bore out his statement. He also was a republican, and a friend of Mr. Hopps.
, John Mariner, the third canvasser, testifies to the same general effect as the other two canvassers. He details the same circumstances ; that the vote was at first two-hundred and fifteen; the manner in which it was reduced, and that the vote and the announcement.were two hundred and ten. He differs a little as to the number of McOaulay’s votes found among Kenny’s votes, saying it was two or three, while the other witnesses say it was fow\ This circumstance does not shake his general evidence, but ought to confirm it, as it shows that there was no collusion among the witnesses to tell a manufactured story. He was a democratic canvasser.
It will be seen that the three canvassers all agree in a consistent, detailed, careful account of the whole matter. It seems almost impossible that they can have testified honestly,’ unless their testimony be a true reflection of the facts. In so far. as their prejudices were concerned, two were republicans and one a democrat. It is not to be presumed that this circumstance would have influenced their official course ; but it show's at least that no indirect influence of that kind could have operated in .favor of Mr. Kinny. They were all intelligent men, and had had experience as inspectors and canvassers.
George H. Fordham, the clerk, sustains them throughout. ITe kept tally. His evidence is very clear, and consistent with that of the canvassers and with itself. There seems no reasonable theory *327 upon wbicb bis evidence can be reconciled with good faith, except the theory that he has testified correctly. He could not testify so minutely and in such detail about what he did himself and must have done consciously, unless he eithér remembered it or was testifying to what he knew to be untrue. And it will be remembered that the canvassers all confirm his statement, and consequently, if he testified untruly, they must all have conspired with him to commit a fraud. This is incredible. There is no evidence to warrant it, except the statements of Petty and Murphy, that they watched Fordham closely, because they knew the unfriendly feeling existing between him and Hopps, and his expressed intention to defeat him (Hopps). There is evidence to justify any suspicion of his honesty. It is true that he did express an intention to defeat Hopps, ,if possible. But his own explanation goes to show that he made this remark as a partisan, and that he did not say that he intended to resort to any dishonorable means in order to defeat Mr. Hopps.
John Glass, a by-stander, heard the announcement of the vote, two hundred and fifteen and two hundred and five. He was present until the vote was recanvassed, and the vote appeared to be two hundred and fifteen. He made a memorandum thereupon of the votes, showing Kenny’s vote two hundred and fifteen. This confirms the statements of the canvassers, and of Fordham, the clerk, as to the first results of the canvass.
James M. Bailey was in Glass’s company, and confirms his statement.
Patrick Keenan confirms the statement of Glass, Bailey, the three canvassers, and the clerk Fordham, as to the first results of the canvass, being two hundred and fifteen for Kenny, which was reduced to two hundred and ten, as testified by the canvassers.
Here there are seven witnesses who agree in sustaining .the account given by the canvassers. Four of them (and those- the only men, except the other clerk, who had the official handling and counting of the votes) deny that either the vote'or the announcement was two' hundred and one. They state that it was at first two hundred and fifteen, and show how it was reduced to two hundred and ten. The other three confirm that part of the account which makes the first results of the canvass two hundred and fifteen, but appear not to have remained present till the final announcement. They all contradict the statement of Jubo, the principal witness for the petitioner, vrho says the first result was two hundred and one, and who is not confirmed in that statement by a single witness.
*328 Here then, are seven witnesses to six, so far as regards the quantity of evidence, against the petitioner. But when we consider the nature of the evidence, the respective opportunities of the witnesses for forming a correct judgment as to the vote, their respective liability to error, the evidence seems certainly clear beyond dispute. The conclusion must be that the announcement was, as returned by the canvassers, and that some mistake occurred somewhere (where does not appear) which led to the impression among some by-standers that the vote was announced two hundred and one.
Secondly. The second question proposed to be considered was, whether, if the vote had been announced two hundréd and one, that circumstance should overcome the official return, which reads two hundred and ten. '.Admitting, then, for the sake of the argument, that the vote was announced two hundred and one; suppose a chairman of a board of canvassers makes an incorrect announcement; is it the duty of the canvassers to return the vote as announced, or as it actually was counted ? No one will pretend to say it should be returned as announced, under such circumstances. Which, then, is the higher evidence of a correct vote ? the official .return, certified and sworn to by all the canvassers, confirmed by the recollection of all of them under oath, or the understanding of the by-stander that the .chairman of the board made an announcement which varies with the official return ?
I confess that the mere statement of the proposition seems to me to carry with it, of its own force, the inevitable answer that the official return should prevail. And I should not have spent so much care and time in preparing this report if it did not appear to me that there really was some danger that the action of this House might wrong both the sitting member and itself, through an honest difference of opinion among the members of the committee. The report has been prepared in no spirit of advocacy of either side of the issue,. but in the hope to place fairly before the House both sides of the controversy in order to aid it in an intelligent decision.
An official return ought not to be set aside on light grounds. While the Constitution makes this House the exclusive judge of the qualifications of its members, this House should not exercise that' right arbitrarily, but is bound by every honest and fair consideration to give a true expression to the wishes of the voters. Certain rules, which have been laid down by the courts to govern cases of this kind, the ordinary laws of evidence and established legal principles, are *329 binding on tbis'Legislature in the examination and decision of these cases, notwithstanding the constitutional privilege of this House as the exclusive judge of the qualifications of its members. Any other principle would introduce confusion and uncertainty, disfranchise the people, and convert the Legislature from a representative body of the people, into an odious partizan machine.
Your committee have had these considerations in view in making this report.
It is also fair to state that contests of seats should not be unduly encouraged. Of course, any gentleman who is fairly elected should receive his seat.’ But in cases of great doubt and uncertainty the official return should prevail. These contests are very expensive to the State. This present contest has already cost .the State four or five hundred dollars in fees of witnesses alone. A way is provided by statute by which the evidence in these cases may be taken before the county judge, where the contest arises, at the expense of the contestants, and thus the fees of witnesses may be saved' to the State and the evidence reported to the Legislature. But this course is seldom resorted to. Contestants prefer to come to the Legislature and Lave their expense of counsel and witnesses paid by the State. Moreover, a practice appears to have grown up of allowing both the successful and the unsuccessful contestant to receive their per diem allowance, as if they had both been duly elected. ’Without imputing any im■proper motive to the contestants in the present contest, it is believed that this practice on the part of the Legislature has sometimes encouraged .contests on light and trivial pretexts, leading to lai’ge expense and to a waste of the time and energies of the Legislature. It has not been unusual for contests of this kind to consume the whole or nearly the whole of the legislative session. In the present case the committee believe they have used all the dispatch that was consistent with a fair and impartial examination of the case; some of their number having been engaged on other important committees of this House, and others having been called away from their duties by sickness for much of the session.
These considerations are suggested, not for the purpose of prejudicing the rights or interests of any one interested in the case, but as reasons why the official returns should not, lightly or without some urgent necessity, be made the subject of a contest; and why the responsibility should be thrown as much as possible on the local boards of county canvassers, who, from their proximity to the places *330 where the disputes arise, and from their direct responsibility to the constituencies whose rights are affected, are quite as likely to form correct judgments as the Legislature.
The adoption of the following resolution is respectfully recommended :
“ Resolved, That William J. C. Kenny is entitled to the seat now occupied by him on the floor of this House.”
Dated February 19, 1861.
Respectfully submitted.
GEORGE H. FISHER.
I concur in the foregoing report, dated February 19, 1861.
N. HOLMES ODELL.
I concur in the foregoing report, dated February 19, 1861.
CHARLES J. SAXE.
Assembly Documents, 1861, No. 71.
Assembly Journal, 1861, page 361.
REPORT OE MINORITY.
Assembly Chamber, February 20, 1861.
Mr. Finch, from a majority of the committee on privileges and elections, to which was referred the petition of Lewis Hopps, claiming the seat now occupied by Wm. J. C. Kenny, reported in writing favorably and by resolution, which report was laid on the table and ordered printed, which was as follows,, to wit:
In AsseMbly, February 20th, 1861.
Report oe the Minority oe the Committee on Privileges and ELECTIONS, ON THE PETITION OE LEWIS HoPPS, CLAIMING THE SEAT now occupied by William J. C. Kenny.
The undersigned, two of the committee of the Assembly on privileges and elections, to which was referred the petition of Lewis Hopps, claiming that he is entitled to the seat in this Assembly now occupied'by the lion. W. J. C. Kenny, report: That they have carefully examined the case, have taken the testimony of a larger number of witnesses, and find the following facts, to,wit:
By the returns from the several election districts, at the county clerk’s office, it appears that said Kenny is elected over said Hopps, by a majority of seven votes, Kenny receiving one thousand nine hundred and sixty-nine, and Hopps, one thousand nine hundred and *331 sixtyrtwo; by the same returns, it appears that in the sixth election district of the seventh ward, Kenny received two hundred and ten votes, and Hopps received two hundred and seventy-three votes. And the undersigned find, that at the close of the canvass, the chairman of the board of canvassers in said sixth district, made public proclamation that said Hopps received two hundred and seventy-three votes, and said Kenny, two hundred and one votes, and that this is the correct number of votes received by said persons respectively. That the returns from all of- the other election districts in said Assembly district are admitted to be correct, and Lewis Hopps is thus elected member of Assembly from the fourth Assembly district of the city of Hew York, by a majority of two votes over the said W. J. 0. Kenny.
As a further fact, conclusive to our minds that Hopps is elected, we find that the whole vote'polled in said sixth election district, is five hundred and ninety-one, of which number Hopps received two hundred and seventy-three, Kenny, two hundred and one, McCauley, forty-seven, O’Shea, twenty-nine, scattering, forty-one; but the official returns in the clerk’s office show two hundred and ten votes for Kenny, and only thirty-two scattering.
The undersigned, therefore, recommend to this honorable body the adoption of the following resolution:
Resolved, That Lewis Hopps, of Hew York, is entitled to the seat in this Assembly now occupied by William J. C. Kenny.
M. FINCH.
0. E. BIRDS ALL.
Assembly Documents, 1861, Ho. Y2.
Assembly Journal, 1861, page 364.
Special Oedee.
Assembly Chambee, Mcureh 2, 1861.
Mr. Finch offered for the consideration of the House, a resolution' in the words following, to wit:
Resol/oed, That the contested election case of Lewis Hopps, claiming the seat occupied by Wm. J. C. Kenny, be made a special order for Wednesday next, at 12 o’clock M.
Mr. Speaker put the question, whether the House would agree to said resolution and it was determined in the affirmative, two thirds of-all the members present voting in favor thereof.
Assembly Journal, 1861, page 458.
*332 REPORTS CONSIDERED.
Assembly Chamber, March 6, 1861.
The House then proceeded to the consideration of the special order being the reports from the majority and the minority of the committee on privileges and elections on the petition of Lewis Hopps, claiming the seat in the Assembly now occupied by W. J. 0. Kenney.
Mr. Pish moved that the privileges of the floor be granted to' Lewis Hopps, pending the consideration of the special order.
' Mr. Speaker put the question whether the House would agree to said motion and it was determined in the affirmative.
Seat awarded to Wm. J. C. Kenny.
The question being upon the adoption of the resolution offered by the majority of the committee in the words following, to wit:
Resolved, That W. J. 0. Kenney is entitled to the seat now occupied by him on the floor of this House.
' Mr. Speaker then put the question whether the House would agree to said resolution and it was determined in the affirmative.
Ayes, 81. Noes, 5.
Assembly Journal, 1861, page 458.